SQUITIERI & FEARON, LLP
Olimpio Lee Squitieri
One Gateway Center
Suite 2500
Newark, New Jersey 07102
Telephone: (201) 445-8595

GLANCY & BINKOW LLP
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars
Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150



KIRBY, MCINERNEY & SQUIRE LLP
Ira M. Press
830 Third Ave
10th Floor
New York, New York 10022
Telephone: (212) 317-2300

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - X
                      :

SINAI ROTH and ERIC SIMON,        :    Civil Action No. 02-2759 (WHW)
Individually and on Behalf of All Others :
Similarly Situated,             :
                      :

Plaintiffs,    :    **AMENDED CLASS**
                      :    **ACTION COMPLAINT**
v.           :    **FOR VIOLATION OF THE**
                      :    **FEDERAL SECURITIES LAWS**
KNIGHT TRADING GROUP, INC., and  :
KENNETH D. PASTERNAK,      :
                      :

Defendants.    :    **JURY TRIAL DEMANDED**
                      :
- - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiffs Sinai Roth and Eric Simon, by their attorneys, for their Amended Class Action Complaint (the "Complaint") allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief based upon the investigation of plaintiffs' attorneys as to all other matters. The investigation includes the thorough review and analysis of public statements, publicly filed documents of Knight Trading Group, Inc. ("Knight" or the "Company"), press releases, news articles and the review and analysis of accounting rules and related literature. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1.      This is a securities class action on behalf of public investors who purchased the common stock of Knight during the period from October 13, 1999, through June 3, 2002 (the "Class Period").

2.      Knight Trading Group, Inc., a Delaware corporation headquartered in Jersey City, New Jersey, is in the business of market-making in equity securities and options in the United States, Europe and Japan. The Company also provides asset management services to institutional investors and high-net-worth individuals. The Company provides its services through two business segments – wholesale securities market-making and asset management – and six principal subsidiaries: (1) Knight Securities; (2) Knight Capital Markets; (3) Knight Roundtable Europe; (4) Knight Securities Japan; (5) Knight Financial Products;

2

and (6) Knight Execution Partners. The Company provides asset management services through its Deephaven Capital Management subsidiary.

3.      During the Class Period, defendants issued public statements in press releases which fraudulently created the false impression that Knight provided its customers with the ability to execute trades immediately at the price specified by the customer. Instead, Knight traders routinely delayed customer trades for the traders' benefit, and as a result, the customers often paid a higher price for stocks when the trades were finally executed.

4.      During the Class Period, defendants employed a scheme wherein they issued public statements in press releases which failed to disclose that Knight traders were engaging in an elaborate system of trading-rule violations known as "front-running," in which customer orders were delayed while defendants' traders made purchases in the same stocks ordered by customers. Knight traders would then – only after they had made their own purchases – process customers' orders, which drove up the prices of the stocks and provided an illegal windfall to the defendants who were reaping profits that should have gone to their customers. By delaying customer purchases, Knight traders prevented those customers from obtaining the proceeds resulting from rising stock prices for the period of time that customers' orders were left unfilled, while defendants siphoned off profits that would have otherwise accrued to the customers during that time. Moreover, when customer orders finally were executed, the stock prices were – as a result of defendants' front-running – more expensive for the customers who initially had

3

placed the orders.  Knight and the Individual Defendant were aware of the true nature of Knight's illegal trading scheme, but failed to disclose the practice to investors.  Instead of disclosing the Company's front-running, defendants concealed the scheme to artificially inflate the Company's share prices and to reap unwarranted profits.

5.     Defendants' fraudulent scheme and its effect on customer purchases were revealed on June 3, 2002, when it was reported that both the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD") were investigating the Company's trading practices.

6.     On the next day, June 4, 2002, the last day of the Class Period, the market reacted to the news regarding the disclosure of the Company's trading scheme and the SEC and NASD investigations.  Knight shares plunged twenty-eight percent (28%) in a single day on these disclosures, and the Class has been damaged thereby.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "1934 Act"), 28 U.S.C. §§ 1331 and 1337. The claims asserted herein arise under, Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b), 78(n), and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

8.     Venue is proper in this District pursuant to Section 27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Many of the acts giving rise to the

4

violations complained of, including the dissemination of false and misleading public statements and financial information, occurred in this District.

9.    In connection with the wrongs alleged herein, defendants used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities, and the facilities of the national securities markets.

## THE PARTIES

10.    Plaintiff Sinai Roth purchased shares of Knight common stock during the Class Period and was damaged thereby, as set forth in the Certification annexed hereto.

11.    Plaintiff Eric Simon purchased shares of Knight common stock during the Class Period and was damaged thereby, as set forth in the Certification annexed hereto.

12.    Knight Trading Group, Inc., headquartered in Jersey City, New Jersey, is a market-maker in equity securities and options on individual equities in the United States, Europe and Japan. As of May 14, 2002, there were 123,153,624 shares of Knight common stock outstanding.

13.    Defendant Kenneth D. Pasternak ("Pasternak") was during the Class Period, and at the time of the wrongs alleged herein, the Chief Executive Officer and a Director of Knight.

14.    Defendant Pasternak is sometimes referred to herein as the "Individual Defendant."

5

15.   By virtue of his position with the Company, the Individual Defendant had the authority and ability to and, in fact, controlled the contents of the Company's documents filed with the SEC, and the Company's press releases. Further, the actions of the Individual Defendant during the Class Period caused the material misrepresentations and omissions concerning the Company's earnings business operations as alleged herein.  The Individual Defendant was aware of the contents of the Company's SEC filings, publicly disseminated reports, press releases and other statements alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their filing or issuance or cause them to be corrected, but failed to do so.

## CLASS ACTION ALLEGATIONS

16.   Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of all other persons or entities who purchased or acquired Knight common stock during the Class Period and were damaged thereby, excluding the defendants herein, their affiliates and any officers or directors of Knight or its affiliates, and any members of immediate families and their heirs, successors and assigns (the "Class").

17.   The Class is so numerous that joinder of all the members of the Class is impracticable.  As of May 14, 2002, Knight had 123,153,624 shares of common stock outstanding and such shares were actively traded on the Nasdaq National Market.  While the exact number of Class members is unknown to plaintiffs at this

6

time, and can only be ascertained through appropriate discovery, plaintiffs believe that Class members number in the thousands.

18.    Plaintiffs' claims are typical of the claims of absent Class members. Members of the Class have sustained damages arising out of defendants' wrongful conduct in violation of the federal securities laws in the same way as the plaintiffs sustained damages from the unlawful conduct.

19.    Plaintiffs will fairly and adequately protect the interests of the Class. They have retained counsel competent and experienced in class and securities litigation.

20.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The Class is numerous and geographically dispersed.  It would be impracticable for each member of the Class to bring a separate action.  The individual damages of any member of the Class may be relatively small when measured against the potential costs of bringing this action, and thus make the expense and burden of this litigation unjustifiable for individual actions.  In this class action, the Court can determine the rights of all members of the Class with judicial economy.  Plaintiffs do not anticipate any difficulty in the management of this suit as a class action.

21.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  These questions include, but are not limited to, the following:

(a)    whether defendants' conduct as alleged herein violated the

7

federal securities laws;

(b) whether the SEC filings, press releases and statements disseminated to the investing public during the Class Period misrepresented Knight's financial condition and results;

(c) whether defendants acted knowingly or recklessly in omitting and/or misrepresenting material facts;

(d) whether the market price of Knight common stock during the Class Period was artificially inflated; and

(e) whether the members of the Class have been damaged, and if so, what is the proper measure of damages.

22. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. To the extent that the Complaint alleges that any forward-looking statements were materially misleading, the defendants made no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements and in fact, defendants had no reasonable basis for their forward looking statements.

## FACTUAL BACKGROUND

23. According to the Company's press releases and SEC filings, Knight is a wholesale securities market-making and asset management company. Through its various subsidiaries, the Company provides a range of services, including wholesale

8

equity market-making, primarily in over-the-counter securities traded in the Nasdaq stock market and on the OTC Bulletin Board.  Knight also provides professional option execution services and operates an asset management business for high-net-worth individuals and institutional investors.

## Defendants' False and Misleading Statements

24.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Knight securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

25.    On October 13, 1999, the first day of the Class Period, defendants disseminated a press release titled "Knight/Trimark Group Reports 49% Growth In Quarterly Revenues and 66% Growth In Quarterly Earnings Over Third Quarter 1998." The press release states that improvements in the Company's execution standards were at least partly responsible for its forty-nine percent revenue growth.  The press release states in part:

> Knight/Trimark Group Reports 49% Growth In Quarterly Revenues and 66% Growth In Quarterly Earnings Over Third Quarter 1998
>
> Market Volatility and Retail Trading Volumes Decline from Record Second Quarter 1999 Levels

9

JERSEY CITY, N.J., Oct. 13 /PRNewswire/ --
Knight/Trimark Group, Inc. (Nasdaq: NITE) today reported
results for the third quarter ended September 30, 1999.
Knight/Trimark Group is the leading market maker in
both Nasdaq securities and the over-the-counter market
for New York Stock Exchange- and American Stock
Exchange-listed securities.

Third Quarter 1999 vs. Third Quarter 1998

-- 49% growth in revenues -- 94% growth in trades
executed
-- 66% growth in net income (1) -- 88% growth in shares
traded

First Nine Months 1999 vs. First Nine Months 1998

-- 130% growth in revenues -- 124% growth in trades
executed
-- 229% growth in net income (1) -- 109% growth in shares
traded

Revenues for the third quarter of 1999 rose 49% to $137.6
million, compared to $92.4 million for the third quarter of
1998. Net income(1) for the third quarter of 1999 totaled
$21.8 million, or $0.19 per share on a diluted basis, a
66% increase from $13.2 million, or $0.13 per share on a
diluted basis for the same period a year ago. Return on
equity for the third quarter and first nine months of 1999,
stated on an annualized basis, was 23% and 45%,
respectively. Net income was also affected by lower state
and local income taxes, which reduced the Company's
effective tax rate to 37% for the third quarter of 1999.

"Knight's third-quarter results represented the third best
quarter in the Company's four year history with a year-
over-year earnings per share increase of 46% to $0.19. We
implemented key initiatives in enhancing our execution
standards, revenue stream diversification and brand
identity," said Knight/Trimark President and Chief
Executive Officer Kenneth D. Pasternak. "The combination
of these initiatives and traditional third quarter seasonal
trends were exacerbated by lighter retail volume and
reduced overall market volatility than the first half of

10

1999. The confluence of these factors resulted in reduced sequential earnings from the second quarter."

Revenues and net income for the third quarter of 1999 decreased 39% and 57% respectively, from the second quarter of 1999. Trades executed and shares traded for the third quarter of 1999 decreased 5% and 17%, respectively, from the second quarter of 1999. The Company maintained pre-tax margins of 25% in the third quarters of 1999 and 1998. Third quarter revenues from the Company's institutional business totaled $37 million, and represented 28% of the Company's third quarter trading revenues, up from 13% of total trading revenues in the third quarter 1998.

"We saw a strong, positive customer response to improvements in Knight's industry leading execution criteria, such as our midpoint single price opening program for Nasdaq securities and our automatic price improvement program on all S&P 500 securities. Providing bottom-line benefits to the individual investor, our innovative execution programs will continue to differentiate Knight from the competition and enable us to expand our market share," continued Pasternak. "We plan to accelerate the diversification of our revenue stream through opportunities in options and international market making. Our 18.92 percent equity stake in EASDAQ, the pan-European exchange, was a strong step in furthering our international strategy."

"The third quarter was testament to the efficiency of our business model, as evidenced by our maintenance of 25% pre-tax margins. We continuously review our operating model to identify potential areas for achieving increased operating efficiency. For example, Knight will realize a reduction in trade processing expenses as a result of our clearance agreement with Merrill Lynch." (emphasis added)

Defendant's knew or recklessly disregarded that the October 13, 1999, press

release was misleading because it fails to disclose that Knight traders were, in an

illegal practice known as "front-running," purchasing stocks before processing

customer orders for trades in those same stocks. As the share prices rose, the Knight traders would then sell their stocks, reaping unwarranted and illegal profits at the expense of their customers. Moreover, the press release states that customers were responding positively to purported improvements in the Company's execution criteria, while, in fact, orders from some of Knight's own customers were not even executed until Knight traders had purchased those same stocks and positioned themselves to profit from the increase in share prices when the delayed customer orders were finally executed.

26.    On January 19, 2000, defendants disseminated a press release announcing revenue results for the fourth quarter and year ended December 31, 1999. The press release, titled "Knight/Trimark Group Reports 223% Growth in Quarterly Earnings and 115% Growth in Quarterly Revenues Over Fourth Quarter 1998," also states that the number of trades executed by the Company grew 122 percent (122%) over the previous year. The press release states in pertinent part:

> Knight/Trimark Group Reports 233% Growth in Quarterly Earnings and 115% Growth in Quarterly Revenues Over Fourth Quarter 1998
>
> Business Model Excels in an Active Market Environment Leading to Record Fourth Quarter Results of $0.50 per share
>
> JERSEY CITY, N.J., Jan. 19 /PRNewswire/ -- Knight/Trimark Group, Inc. (Nasdaq: NITE) today reported results for the fourth quarter and year ended December 31, 1999. Knight/Trimark Group is the leading market maker in both Nasdaq securities and the over-the-counter market for New York Stock Exchange- and American Stock Exchange-listed securities.

Fourth Quarter 1999 vs. Fourth Quarter 1998 (4)
 * 115% growth in revenues     *118% growth in trades
executed
 * 233% growth in net income      * 116% growth in
shares traded

Fourth Quarter 1999 vs. Third Quarter 1999 (4)
 * 86% growth in revenues        * 47% growth in
trades executed
 * 167% growth in net income      * 46% growth in
shares traded

Full Year 1999 vs. Full Year 1998 (4)
 * 125% growth in revenues       * 122% growth in
trades executed
 * 231% growth in net income (1)   * 111% growth in
shares traded

Revenues for the fourth quarter of 1999 rose 115% to
$256.4 million, compared to $119.3 million for the fourth
quarter of 1998. Net income for the fourth quarter of 1999
totaled $58.4 million, or $0.50 per share on a diluted
basis, a 233% increase from $17.5 million, or $0.17 per
share on a diluted basis for the same period a year ago (4).
One-time expenses incurred in connection with the
Company's acquisition of Arbitrade reduced earnings by
$0.04 per share on a diluted basis. The Company showed
pre-tax margins of 37% in the fourth quarter of 1999 (39%
excluding merger expenses), up from 25% in 1998. Return
on equity for the fourth quarter and full year 1999, stated
on an annualized basis, was 54% and 48%, respectively.

"Knight is the only market maker that predicates its
business model on its customer-driven focus, innovative
technology, scale and highly skilled human capital. Our
record results in 1999's fourth quarter demonstrate that
this value-added proposition is the optimal model to drive
our future growth.  Market conditions of orderly volatility
and high volume in the fourth quarter presented an ideal
environment for our business model. We executed
470,000 trades per day on average, a 47% increase from
the previous quarter and a 118% gain from the fourth
quarter 1998," said Kenneth D. Pasternak, the Company's
President and Chief Executive Officer. "We also made

significant headway during the past quarter in our efforts to diversify our revenue stream, evidenced by the fact that higher margin institutional order flow totaled $78 million or 31% of our overall fourth quarter trading revenues, up from 19% of total trading revenues in the fourth quarter 1998. These developments and high trading volumes are the main drivers of the 233% quarter-over-quarter and 231% year-over-year gains on Knight's bottom line."

Revenues and net income for the fourth quarter of 1999 increased 86% and 167%, respectively, from the third quarter of 1999. Trades executed and shares traded for the fourth quarter of 1999 increased 47% and 46%, respectively, from the third quarter of 1999. In addition, the Company set a new volume record on January 10, 2000, executing over 733,000 trades and over 722 million shares. (emphasis added)

Defendant knew or recklessly disregarded that the January 19, 2000, press release was misleading because it fails to disclose the improper trading practices at Knight. Although defendants claimed to be routinely surpassing previous record levels of trades executed, the execution of customers' orders were delayed while defendants' traders purchased those same stocks ahead of the customers and at a lower price. Knowing that the customer orders would drive up share prices when finally executed, defendant's traders were thus able to profit at the expense of the customers whose trades were delayed while the price of the stocks rose.

27. On February 29, 2000, Knight continued to mislead investors about its trading practices in a press release titled "Knight/Trimark Group Executes Record Trade Volume of 877,071 Trades in Single Day." The press release touts the Company's ability to process hundreds of thousands of stock trades, comprising hundreds of millions of shares, per day. The February 29, 2000, press release

14

states in pertinent part:

> Knight/Trimark Group Executes Record Trade Volume of
> 556,000 Trades in Single Day
>
> Knight/Trimark Group Executes Record Trade Volume of
> 877,071 Trades In Single Day
> JERSEY CITY, N.J., Feb. 29 /PRNewswire/ --
> Knight/Trimark Group, Inc. (Nasdaq: NITE), the largest
> wholesale market marker in U.S. equity securities, today
> reported that it executed 877,071 trades on February 24,
> 2000, representing a cumulative share volume of over 810
> million shares in both OTC and listed securities.
>
> The company's share volume accounted for approximately
> 12 percent of the February 24reported Nasdaq, New York
> Stock Exchange and American Stock Exchange share
> volume. Knight/Trimark executed over 81 billion shares
> during 1999, a share volume second only to those of
> Nasdaq and the NYSE.
>
> Knight/Trimark, headquartered in Jersey City, NJ, is the
> parent company of Knight securities, Trimark Securities
> and Knight Financial Products (formerly Arbitrade,
> LLC).Knight is the largest wholesale market maker in U.S.
> equity securities. <u>The four-year old Knight/Trimark
> Group, as the largest destination for on-line trade
> executions, is the unseen"processing power" behind the
> explosive growth in on-line securities trading</u>. The firm
> was recently selected to the Fortune "e-50 Stock Index,"
> an elite collection of companies that are shaping the new
> Internet based economy. The firm employs more than 800
> people worldwide. (emphasis added).

Defendants knew or recklessly disregarded that the February 29, 2000, press

release is misleading because it fails to disclose the improper trading practices at

Knight. Regardless of record trade volumes, Knight traders were fraudulently

delaying customers trades so they could purchase shares of those same stocks,

resulting in higher prices and lower profits for customers, while defendants'

traders benefited from the increased share prices when the trades were finally executed.

28.     Approximately six weeks later, on April 19, 2000, defendants disseminated a press release that announces revenue results for the first quarter of 2000.  The press release includes a statement from defendant Pasternak, emphasizing the Company's ability to make immediate trades and to "trade when our clients want to trade and at the price they specify." The press release states in pertinent part:

> Knight/Trimark Group Reports 223 Percent Growth in Quarterly Earnings And 152 Percent Growth in Quarterly Revenues Over First Quarter 1999
>
> Revenues for the first quarter of 2000 rose 152% to $513.1 million, compared to $203.4 million for the first quarter of 1999. Pro forma net income for the first quarter of 2000 totaled $135.6 million, or $1.07 per share on a diluted basis, a 223% increase from $41.9 million, or $0.34 per share on a diluted basis for the same period a year ago. The Company achieved pre-tax margins of 42% in the first quarter of 2000, up from 36% in the first quarter of 1999. Return on equity for the first quarter of 2000, stated on an annualized basis, was 97%. The month of March 2000 was the Company's best performing month in its history, with both record trade volumes and net trading revenues.
>
> Revenues and pro forma net income for the first quarter of 2000 increased 81% and 104%, respectively, from the fourth quarter of 1999 (1). Equity trades executed and equity shares traded for the first quarter of 2000 increased 46% and 69%, respectively, from the fourth quarter of 1999.
>
> The Company's options market making business generated total net trading revenue of approximately $32.9 million, versus $14.7 million during the first quarter of

1999. Additionally, the Company's asset management business generated $9.4 million in asset management fees during the first quarter of 2000, up 176% from the same period a year ago.

"Our success in the first quarter 2000 demonstrates that Knight is not reliant on the direction of the market, up or down. Instead, market volume and volatility are the main drivers of our business," said Kenneth D. Pasternak, the president and chief executive officer of Knight/Trimark Group. "The paradigm shift toward the self-directed investor made Knight viable. Our value proposition is that we trade when our clients want to trade and at the price they specify. We stand apart from other market participants by the fact that we provide clients with immediacy and proactive guaranteed liquidity on their transactions. Our ability to provide retail investors with this level of service has, in turn, made Knight an increasingly attractive execution destination for institutional investors looking to trade their large block orders intelligently and efficiently." (emphasis added)

The press release fails to disclose, despite defendant Pasternak's contrary claims, rather than delivering immediacy and "trad[ing] when [ ] clients want to trade and at the price they specify," Knight traders were engaged in a scheme to fraudulently delay customers' trades while Company traders made their own stock purchases of the same stocks, thereby making a profit when the customers' trades finally were executed and drove up the prices of those stocks. Defendants knew or recklessly disregarded that the April 19, 2000, press release was false and misleading because defendants' traders, in fact, delayed customer trades for the Company traders' benefit, rather than executing those trades immediately.

29.     Approximately three months later, on July 19, 2000, defendants disseminated a Company press release announcing second quarter revenue results for 2000.  However, defendants continued to mislead the investing public regarding Knight's revenues, failed to disclose its traders' front-running or its effect on Knight's earnings in the July 19, 2000, press release, which states in pertinent part:

> Knight Trading Group Reports 16% Growth In Quarterly Earnings and 23% Growth In Quarterly Revenues Over Second Quarter 1999
>
> Revenues for the second quarter of 2000 rose 23% to $313.5 million, compared to $254.2 million for the second quarter of 1999. Net income for the second quarter of 2000 totaled $67.2 million, or $.53 per share on a diluted basis, a 16% increase from $58.0 million, or $0.46 per share on a diluted basis for the pro forma period a year ago. The Company achieved pre-tax margins of 34.7% in the second quarter of 2000. Return on equity for the second quarter of 2000, stated on an annualized basis, was 39.7%.
>
> Revenues and net income for the second quarter of 2000 decreased 39% and 50%, respectively, from the pro forma first quarter of 2000. Equity trades executed and equity shares traded for the second quarter of 2000 decreased 24% and 51%, respectively, from the first quarter of 2000, primarily due to decreased retail trading volume in the latter half of the second quarter.
>
> The Company's options market-making business generated total net trading revenue of approximately $37.8 million, versus $20.6 million during the second quarter of 1999. Additionally, the Company's asset management business generated $10.9 million in asset management fees during the second quarter of 2000, up 71% from the same period a year ago.

18

"Knight focused its efforts during the second quarter on achieving its stated business objectives," said Kenneth D. Pasternak, the Chief Executive Officer and President of Knight Trading Group. "We made significant strides toward growing our client base, expanding our systems capacity and processing power, enhancing our execution standards, and building our business model in international markets. Indicative of our success during the past quarter is what we accomplished in the options industry. In less than six months since entering the business, we now are a major player in options trading. We have a presence on all five of the major U.S. options exchanges, and can handle options orders in more than 250 companies."

"On the international front, we made significant progress during the second quarter toward building our business model in Europe and Japan," continued Mr. Pasternak. "We have established our joint venture with Nikko Securities to provide wholesale market-making services in Japanese equity securities. In short, we are delivering -- faster than many thought we would -- on our promises to carve out a dominant role in options trading and to transport our business model to international markets."

"We also were successful in attracting order flow from a more diverse client base during the past quarter," said Mr. Pasternak. "Institutional order flow, for example, accounted for 44% of our equity trading revenues, versus 19% in the second quarter of 1999. We also implemented a new trading service in Nasdaq stocks that enhances our execution capabilities in the OTC market by offering more opportunities for price improvement through executions requiring no dealer intervention. The viability of the Nasdaq InterMarket, in which we are the largest trading firm, was reaffirmed when three electronic communications networks (ECNs) agreed to forge links to that market. All of these developments indicate that Knight is well positioned to become the liquidity center best equipped to provide superior order executions in OTC and listed securities transactions." (emphasis added)

19

30.   Approximately three months later, on October 18, 2000, defendants disseminated a press release announcing third-quarter revenue results for 2000. The press release includes statements by defendant Pasternak, who notes a variety of complex market factors and interrelationships and their negative effects on the Knight's earnings.  Defendants failed to disclose, however, the effect of the Company's trading practices on its earnings and growth.  Similarly, the press release fails to disclose that Knight traders routinely delayed customer trades to allow the Company's own traders to purchase those same stocks before executing customers' orders.  When the customers' orders were finally executed, the customers paid a higher price for the stock and thus made a lower profit, if any.  The October 18, 2000, press release states in pertinent part:

> Knight Trading Group Reports Third Quarter Earnings Per Share of $0.16 Market Conditions and International Expansion Costs Impact Knight's Third Quarter Results
>
> Revenues for the third quarter of 2000 rose 22% to $199.1 million, compared to $163.8 million for the third quarter of 1999. Net income for the third quarter of 2000 totaled $20.6 million, or $.16 per share on a diluted basis, a 27% decrease from $28.2 million, or $0.22 per share on a diluted basis for the pro forma period a year ago. The Company achieved pre-tax margins of 17.3% in the third quarter of 2000. Return on equity for the third quarter of 2000, stated on an annualized basis, was 12%.
>
> Revenues and net income for the third quarter of 2000 decreased 37% and 70%, respectively, from the second quarter of 2000. Equity trades executed and equity shares traded for the third quarter of 2000 decreased

6% and increased 2%, respectively, from the second quarter of 2000.

The Company's options market-making business generated total net trading revenue of approximately $30.6 million in the third quarter, versus $18.7 million during the third quarter of 1999. Additionally, the Company's asset management business generated $9.8 million in asset management fees during the third quarter of 2000, up 91% from the same period a year ago.

"The markets experienced a great deal of uncertainty during the third quarter, as evidenced by the recurring declines in Nasdaq and widespread low volatility," said Kenneth D. Pasternak, Chief Executive Officer and President of Knight Trading Group. "This uncertainty was caused by a confluence of factors -- namely the lingering effects of the second quarter market correction, summer seasonality, and investor concern over energy costs, corporate earnings, the weak Euro and the upcoming presidential election. We believe that this market environment caused self-directed individual investors to take a more conservative approach to investing, leaving the majority of trading activity to professional traders, program traders and institutions. This market dynamic was accompanied by a rotation in our order flow mix away from growth and technology stocks toward a heavier concentration in large cap issues such as those in the Nasdaq 100 and on the NYSE -- stocks for which Knight posts lower revenue capture per share. All of these factors hurt Knight's profit performance during the third quarter."

31.    January 17, 2001, defendants disseminated a press release titled

"Knight Trading Group Reports Fourth Quarter Earnings Per Share of $0.28 -

Market Conditions and International Expansion Costs Impact Knight's Fourth

Quarter Results."  The press release announces Knight's revenue results for the

fourth quarter of 2001, and includes lengthy statements by defendant Pasternak,

21

similar to his statements in the October 18, 2000, press release.  Again, the press release fails to disclose any front-running by Knight traders and its effect on investors and the Company's revenues. The January 17, 2001, press release states in part:

> Knight Trading Group Reports Fourth Quarter Earnings Per Share of $0.28
> - Market Conditions and International Expansion Costs Impact Knight's Fourth Quarter Results
>
> Revenues for the fourth quarter of 2000 decreased 11% to $251.3 million, compared to $281.7 million for the fourth quarter of 1999. Net income for the fourth quarter of 2000 totaled $35.3 million, or $.28 per share on a diluted basis, a 41.5% decrease from $60.3 million, or $0.47 per share on a diluted basis for the pro forma period a year ago. The Company achieved pre-tax margins of 22.9% in the fourth quarter of 2000. Return on equity for the fourth quarter of 2000, stated on an annualized basis, was 18.5%.
>
> Revenues and net income for the fourth quarter of 2000 increased 33.9% and 71.3%, respectively, from the third quarter of 2000. Equity trades executed and equity shares traded for the fourth quarter of 2000 increased 8% and 13%, respectively, from the third quarter of 2000.
>
> The Company's options market-making business generated total net trading revenue of approximately $48.5 million in the fourth quarter, up 135% from the fourth quarter of 1999. Additionally, the Company's asset management business generated $10.9 million in asset management fees during the fourth quarter of 2000, up 159% from the same period a year ago.
>
> "The markets reflected the uncertainty of investors during the fourth quarter, as evidenced by the significant declines across the major financial indices," said Kenneth D. Pasternak, Chairman, Chief Executive Officer and President of Knight Trading Group. "The Nasdaq closed its worst year ever, plunging 33% in the fourth quarter alone, and the New York Stock

Exchange ended its worst year since 1981. The year closed out with a modest 6% decline in the Dow Jones Industrial Average versus the massive 39% decline in the Nasdaq Composite Index. Tax loss selling, portfolio repositioning and bargain hunting caused volumes on both exchanges to rebound to record levels in December. Investors, however, continued to seek refuge in larger cap, defensive stock issues as a safe haven from the volatility of technology and Internet stocks."

"We believe that the market correction kept many self-directed individual investors on the sidelines or in larger cap, defensive stock issues throughout the fourth quarter," continued Mr. Pasternak. "This mix of stocks -- for which Knight posts lower revenue capture per share -- negatively impacted our revenue for the quarter. These pressures were partially overcome by our unique trading methodology and our diverse client base and product offerings, resulting in a solid fourth quarter despite these challenging market conditions."

32.    On April 18, 2001, defendants disseminated a press release announcing first-quarter 2001 revenue results.  The press release includes several statements by defendant Pasternak which are similar to his statements in the October 18, 2000 and January 17, 2001 press releases, but again fails to disclose front-running by Knight traders and its effect on the Company or its customers.  The April 18, 2001, press release states in pertinent part:

Knight Trading Group Reports Earnings Per Share of $0.21, Ahead of Reduced Expectations

Difficult Market Environment During First Quarter 2001 Impacts Quarterly Results

International Expansion Investment Costs Total $0.08 Per Share
Revenues for the first quarter of 2001 declined 56% to $225.6 million, compared to $510.6 million for the first

23

quarter of 2000. Net income for the first quarter of 2001 totaled $26.9 million, or $0.21 per share on a diluted basis, an 80% decrease from $135.7 million, or $1.07 per share on a pro forma diluted basis for the same period a year ago. The Company achieved pre-tax margins of 19.1% in the first quarter of 2001, down from 42.5% in the first quarter of 2000. Return on equity for the first quarter of 2001, stated on an annualized basis, was 13.8%. Costs related to international expansion efforts accounted for approximately $10 million, equivalent to $0.08 per share.

Revenues and net income for the first quarter of 2001 decreased 10% and 24%, respectively, from the fourth quarter of 2000. For the first quarter, equity trades executed declined 11% versus the fourth quarter of 2000. Equity shares traded for the first quarter of 2001 increased 7% from the fourth quarter of 2000.

The Company's options market maker generated total net trading revenue of approximately $41.6 million during the first quarter of 2001, versus $33.0 million during the first quarter of 2000. Additionally, the Company's asset management business generated $12.7 million in asset management fees during the first quarter of 2001, up 30% from $9.8 million in the same period a year ago.

"First quarter 2001 was the most challenging trading environment Knight has experienced, characterized by severe declines across most of the leading indexes," stated Kenneth D. Pasternak, Chairman, Chief Executive Officer and President of Knight Trading Group. "The Nasdaq, DJIA, S&P 500 and Russell 2000 indices closed down 26%, 8%, 12% and 7%, respectively, during the quarter, despite increased trading volume."

"The precipitous decline in the Nasdaq Composite Index, which went from a high of 5,049 on March 10, 2000 to its first quarter 2001 low of 1,820 on March 29th, negatively impacted trading activity by the self-directed investor -- Knight's core constituency. Record levels of money flows into money market funds during the first two months of this year reflected the bias in self-directed investor sentiment towards cash rather than equities. Absent any economic catalyst, we believe the self-directed investor will

24

continue to remain cautious as the market cycle bottoms out."

"Knight's efforts to diversify our revenue stream through enhanced product offerings and by broadening our client base have been important factors in partially offsetting the negative effects of the current market," continued Mr. Pasternak. "Despite the recent cyclical downturn in the equity markets, we believe there is a powerful, ongoing secular trend towards self-directed investing as a means of wealth creation and management. Evidence of this trend is clearly outlined when one reviews Knight's average daily equity trades for the first quarters of the past five years: 63,000 in 1997, 124,000 in 1998, 306,000 in 1999, 700,000 in 2000, and 487,000 in 2001. We believe that positioning Knight as a single point of entry for order flow across multiple product, client and geographic lines will enhance our ability to capture the benefits of this trend when the market cycle swings back into positive territory."

33.     On July 18, 2001, defendants disseminated a press release "Knight Trading Group Reports Earnings Per Share of $0.03 After Non-Operating Charges of $0.07 Per Share," announcing second-quarter 2001 revenue results, including a twenty-seven (27%) decline in revenues and a 94% decline in net income from the same quarter in 2000.  However, the press release fails to disclose the effects of front-running by the Company's traders on the revenue results.  Again, defendants attributed the decline in revenues to a complex set of factors but failed to disclose the complex scheme of trading-rule violations by Knight's stock traders or its effect on investors.  Defendants knew or recklessly disregarded that at the same time that Knight's customer orders were being systematically delayed so that the Company's own traders could purchase those same stocks for their personal benefit, and the customers, in turn, were

paying higher prices for stocks as a result of defendants' front-running scheme.

34.   Approximately three months later, on October 17, 2001, defendants disseminated a press release announcing third-quarter revenue results for 2001, including a thirty percent decline in revenues and a 128% decline in net income from the same period a year earlier.  The press release and statements therein by defendant Pasternak blame a variety of market factors for the decline, but fail to disclose any trading-rule violations or front-running by the Company's stock traders.  The press release states in pertinent part:

> Knight Trading Group Reports Third Quarter 2001
> Loss Per Share of $0.05
>
> Knight's results were impacted by adverse market conditions during the quarter and four lost trading days following the tragic events of September 11, 2001. Revenues for the third quarter of 2001 declined 30% to $130.9 million, compared to $187.9 million for the third quarter of 2000. Net loss for the third quarter of 2001 totaled $5.7 million, or ($0.05) per share on a diluted basis, a 128% decrease from $20.6 million, or $0.16 per share on a diluted basis for the same period a year ago. The Company achieved pre-tax margins of (7.7)% in the third quarter of 2001, down from 18.4% in the third quarter of 2000. Return on equity for the third quarter of 2001, stated on an annualized basis, was (2.7%).
>
> "Knight's first quarterly loss since its founding occurred during an unprecedented three months in both financial and American history," said Kenneth D. Pasternak, Chairman & Chief Executive Officer of Knight Trading Group. "First, a cyclical low in the equity markets was compounded by the traditional third-quarter seasonal low. Second, market participants were -- and are still -- adjusting to the major market structure issues brought about by the introduction of decimalization and the one-penny

26

Minimum Price Variant in April 2001. And finally, the effects of the September 11th attacks were two-fold: they resulted in the four-day closure of the market, and a consequential dramatic decline in major market indices."

During the four days following the World Trade Center attack, Knight incurred expenses of approximately $0.02 per share that could not be offset by trading revenue due to the market's closure. Losses from international expansion efforts were $10.6 million, equivalent to $0.09 per share.

Non-operating charges in the third quarter were $6.6 million on a pre-tax basis, or $4.1 million on an after-tax basis, equivalent to $0.03 per share. These charges relate to the write-down of excess real-estate capacity.

The Company's market-making activity relating to options generated total net trading revenue of approximately $36.8 million during the third quarter of 2001, versus $23.1 million during the third quarter of 2000. Additionally, the Company's asset management business generated $10.5 million in asset management fees during the third quarter of 2001, up 5% from $10.0 million in the same period a year ago. This reflects an increase in new assets under management.

Knight built its original business on the growth in electronic brokers and the trend in self-directed investing in the U.S. From 1997 through 2000, the Company made substantial investments in technology, people and operations to meet the capacity needs of a booming equities market. In that time, the Company's revenues grew at a compounded annual growth rate of more than 66%, and equity trades executed increased at a compounded annual growth rate of more than 90%.

"Knight is adjusting to a new era that began in early 2001," Mr. Pasternak said. "When capital market activities came to an unexpected halt and growth and

technology stocks fell out of favor, Knight started to right-size its business to reflect the suddenly stagnant market. These efforts continued through the third quarter, and today, we continue to review all aspects of our business, including real estate holdings, expenses and headcount. Our European operations are being scaled back to better reflect the current market environment."

Mr. Pasternak added, "While Knight is adjusting to these new market realities, we also are carefully planning for the future by maintaining and even growing our competitive positions. The scale, capacity and technology that made Knight a low-cost trade execution destination for broker-dealers are increasingly attractive to institutional investors in a market with new dynamics. Meanwhile, we are seeing consolidation and abdication among market participants in the U.S. as the one-penny MPV and decline in depth-of-book further commoditize the equities trading business. We continue to modify our trading algorithms to better price the liquidity we provide and to improve revenue capture per trade.

"Knight will remain focused on our objectives to protect our strong balance sheet, manage the Company for profitability, and maintain or increase our competitive position in equities, derivatives and asset management," Mr. Pasternak said. "While we expect to be a beneficiary of market consolidation, we will balance business opportunities with challenging business conditions, keeping efforts to increase our competitive position in proportion with our profitability objectives."

35.    On January 16, 2002, defendants disseminated a press release announcing revenues for the fourth quarter of 2001. The press release announces, among other things, a 35% decline in revenues, a 62% decline in net income, a 9% decline in U.S. equity trades executed and a 74% increase in U.S. equity shares traded from the same period a year earlier. The press release includes a statement from defendant Pasternak in which he summarizes the effects of a "difficult market

28

environment" on the Company's revenue.  The press release states in part:

> Knight Trading Group Reports Fourth Quarter 2001
> Income Per Share of $0.11
>
> "2001 was the most challenging year in the history of
> Knight Trading Group, but it allowed us to prove that the
> Knight business model can prevail through extraordinary
> obstacles presented by a difficult market environment and
> an evolving market structure," said Kenneth D. Pasternak,
> Chairman and Chief Executive Officer of Knight Trading
> Group. "The bear market continued to affect our returns,
> but our U.S. equities business is responding well to
> rightsizing and cost-control efforts, as well as to
> modifications in our trading algorithms and inventory
> management practices following the introduction of the
> one-penny Minimum Price Variant. In Europe, an
> equivalent market slowdown affected the extensive
> operations we built during a robust market, and we made
> painful but necessary headcount reductions to keep the
> business poised for the market's recovery. ..."

On the same day, January 16, 2002, the <u>Bloomberg News Service</u> ("Bloomberg")

published an article titled " Knight 4th-Qtr Profit Falls 62% on Declining Stocks."

The article also quotes defendant Pasternak, who blames that "the bear market,"

"decimalization" – trading stocks in penny increments – and his underestimation of

the effect of "the shrinking spread" – the difference between the prices at which

investors buy and sell stocks, and the basis for a market maker's earnings – as the

reasons for the company's decline in revenues.  Neither the press release nor

defendant Pasternak's statements to Bloomberg disclosed the complex system of

rule violations that were affecting Knight's bottom line.  Defendants knew or were

reckless in not knowing that the Company's earnings were affected by the front-

running scheme, which illegally enriched the Company's traders while siphoning profits away from customers whose trades were delayed.

36.   Significantly, neither the January 16, 2002, Company press release, defendant Pasternak's statements therein, nor Pasternak's statements to Bloomberg disclose that Robert. S. Stellato ("Stellato"), Knight's former Global Head of Institutional Sales, had reported the Company's front-running to the NASD in 2001.  Stellato's arbitration complaint filed with the NASD alleges that Knight traders were front-running customers' orders or used their knowledge of existing buy and sell orders to profit from the expected impact on prices.  Moreover, defendants failed to disclose that the NASD was investigating its trading practices, pursuant to Stellato's complaint, in the Company's Form 10-K for 2001, filed March 28, 2002 with the SEC; failed to disclose the investigation in its amended Form 10-K/A for 2001, filed April 3, 2002; and failed to disclose the investigation in the Company's Form 10-Q, filed May 15, 2002.  Defendants knew or recklessly disregarded that the failure to disclose Stellato's complaint and the NASD investigation in Knight's above-mentioned SEC filings – despite boilerplate language in each of those documents which discusses the possibility of such complaints or investigations – was false and misleading to investors.

37.   Approximately three months later, on April 17, 2002, defendants disseminated a press release which announced a loss for the first quarter of 2002, including an eighteen percent decline in revenues and a 194% decline in net income from the previous quarter.  The press release attributes the loss to a variety

of factors and states in pertinent part:

> Knight Trading Group Reports Loss Per Share of $0.10
> After Non-Operating Charges of $0.03 Per Share

> Difficult Market Environment and One-Penny Minimum
> Price Variation Continue to Pressure Revenue Capture Per
> Share

> The institution of a one-penny Minimum Price
> Variation (MPV) has introduced new challenges for
> participants in the securities marketplace. The
> one-penny MPV was instituted concurrently with the
> full implementation of decimalization for Nasdaq
> issues on April 9, 2001 and for NYSE- and Amex-listed
> issues on January 29, 2001. The one-penny MPV,
> instituted by the exchanges and the Nasdaq market, is
> a separate issue from decimalization, which was an
> SEC-mandated change.

> "We are tailoring Knight to fit the one-cent MPV
> market structure and challenging market conditions
> that continue to affect our financial results," said
> Anthony M. Sanfilippo, Interim Chief Executive Officer
> of Knight Trading Group. "First, Knight is exploring
> every means of increasing revenue capture per trade.
> We are expanding our product offerings and
> developing human capital to attract more higher-
> margin business from institutions who select Knight
> for capital commitment, deep liquidity, scale, and
> market-making that's independent of investment
> banking and research. Institutions tap Knight's
> liquidity to maximize their portfolio returns. Knight's
> liquidity is also valuable to broker-dealers who seek
> Knight's high execution quality, because their trades
> will be executed completely and quickly, with Knight
> stepping into the role of principal and committing
> capital to be the other side of the trade. Knight is
> determining how to better reflect the value of our
> liquidity and our service to all clients.

> "Second, Knight is working to decrease costs even
> more, particularly costs associated with an
> infrastructure that was built for the explosion in

31

individual investing and that's now too heavy with overcapacity to be supported by anemic revenue streams during a down market and a changed market structure," Mr. Sanfilippo continued. ``We are managing our whole business like we would an integrated portfolio of assets. Each business must build revenues and balance costs, and each will 'live and die' by its returns and its strategic contribution to Knight as a whole. For example, while Knight has cut in half quarterly losses in Europe since the middle of 2001, there is more work to do. We will conclude our evaluation of our London-based operations in the second quarter and determine the appropriate changes in order to minimize losses by the end of the year. Across all of its subsidiaries, Knight has room to explore synergies and create efficiencies in capital spending, infrastructure and management.

"Regardless of the dynamic nature of the marketplace, we are confident in Knight's core business model. Our trading methodologies, scale, technology and human capital have made Knight the market leader, and we believe we understand our space better than any of our competitors," Mr. Sanfilippo said. ``We are still adjusting the business for survival in the near term, but we are also reinventing our Company for long-term success. Knight's domestic equities business was profitable in the first quarter and we enjoy significant market share. However, we want to be an impact player in every space in which we exist, not just in domestic equities, with an eye toward appropriate return for each business line. Knight's excellent financial health, with a strong cash position and no debt, gives us flexibility to make important but prudent investments in our future. Our primary goal is to be the low-cost provider and one-stop execution venue for institutions and broker-dealers."

Defendants knew or recklessly disregarded that the April 17, 2002, press release is

misleading because it fails to disclose that front-running trades by defendants'

stock traders were siphoning profits from the Company's bottom line as well as

32

from Knight's customers. Despite defendants' claims about the Company's ability to execute trades "quickly and completely," Knight's stock traders were in fact reaping illegal profits while customer orders were delayed at the expense of both customers and the Company's shareholders.

38.   On June 3, 2002, the last day of the Class Period, defendants' stock-trading scheme, and the parallel investigations of the SEC and NASD into Knight's trading practices finally were revealed. On the next day, June 4, 2002, These revelations drove the price of Knight's shares down, losing twenty-eight percent (28%) of their value from the previous day's close.

## Defendants' Scienter

39.   Defendants' false representations and material omissions were made with <u>scienter</u> in that: defendants knew or recklessly disregarded that the public documents and statements issued or disseminated by Knight were materially false and misleading as described above; and knowingly and substantially participated in the preparation and/or issuance or dissemination of such statements or documents.

40.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made. To the extent there were any forward looking statements, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause

33

actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of knight who knew that those statements were false when made.

41.    Any warnings contained in the press releases and the financial statements quoted herein were generic statements of the kind of risks that affect any high profile company and misleadingly contained no specific factual disclosure of any of the looming problems with Knight which placed Knight's profitability and growth at risk.

### COUNT I

#### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

42.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for those allegations alleging fraud.

43.    At all relevant times, the defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct whereby they knowingly and/or recklessly made and/or failed to correct

public representations which were or had become materially false and misleading regarding Knight's financial results and operations. This continuous course of conduct resulted in the defendants causing Knight to publish public statements which they knew, or were reckless in not knowing, were materially false and misleading, in order to artificially inflate the market price of knight stock and which operated as a fraud and deceit upon the members of the Class.

44.    The Individual Defendant is liable as a direct participant in and as a controlling person of the wrongs complained of herein. By virtue of his position of control and authority as an officer and director of Knight, the Individual Defendant was able to and did, directly or indirectly, control the content of the aforesaid statements relating to the Company, and/or the failure to correct those statements in timely fashion once he knew or was reckless in not knowing that those statements were no longer true or accurate. The Individual Defendant caused or controlled the preparation and/or issuance of public statements and the failure to correct such public statements containing misstatements and omissions of material facts as alleged herein.

45.    In ignorance of the adverse facts concerning Knight's business operations and earnings, and in reliance on the integrity of the market, plaintiffs and the members of the Class acquired Knight common stock at artificially inflated prices and were damaged thereby.

46.    Had plaintiffs and the members of the Class known of the materially adverse information not disclosed by the defendants, they would not have

35

purchased Knight's common stock at all or not at the inflated prices paid.

47.    By virtue of the foregoing, defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANT

48.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for those alleging fraud.

49.    This count is asserted against the Individual Defendant and is based upon Section 20(a) of the 1934 Act.

50.    The Individual Defendant, by virtue of his office, directorship, stock ownership and specific acts was, at the time of the wrongs alleged herein and as set forth in Count I, a controlling person of Knight within the meaning of Section 20(a) of the 1934 Act.  The Individual Defendant had the power and influence and exercised the same to cause Knight to engage in the illegal conduct and practices complained of herein by causing the Company to disseminate the false and misleading information referred to above.

51.    The Individual Defendant's position made him privy to and provided him with actual knowledge of the material facts concealed from plaintiffs and the Class.  By virtue of the conduct alleged in Count I, the Individual Defendant is liable for the aforesaid wrongful conduct and is liable to plaintiffs and the Class for damages suffered.

36

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment:

A.      Determining that the instant action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages and/or rescission as appropriate against defendants, in favor of plaintiffs and all members of the Class for damages sustained as a result of defendants' wrongdoing;

C.      Awarding plaintiffs and members of the Class the costs and disbursements of this suit, including reasonable attorneys', accountants' and experts' fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:     July 9, 2002

SQUITIERI & FEARON, LLP

Olimpio Lee Squitieri (OLS-1684)
One Gateway Center
Suite 2500
Newark, New Jersey 07102
Telephone:   (201) 445-8595

37

GLANCY & BINKOW LLP
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars
Suite 311
Los Angeles, California  90067
Telephone:  (310) 201-9150

KIRBY, MCINERNEY & SQUIRE LLP
Ira M. Press
830 Third Ave
10th Floor
New York, New York 10022
Telephone:   (212) 317-2300 **Ext.** 213

Attorneys For Plaintiffs